IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LATONYA L. WARD, | ) | CASE NO.  1:15-cv-01474 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Latonya L. Ward ("Plaintiff" or "Ward") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for Supplemental Security Income ("SSI") benefits.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 12.   As explained more fully below, the Court **AFFIRMS** the Commissioner's decision.

## I.  Procedural History

In a decision dated August 21, 2006, Ward was found eligible for SSI benefits as of May 12, 2005, with a sedentary residual functional capacity ("RFC").  Tr. 17, 59-70.  Ward did not receive benefits based on that decision because she became ineligible based on her husband's income.[1]  Tr. 157.  On May 9, 2012, Ward protectively filed[2] a new application for SSI benefits.

---

[1] During a consultative evaluation, Ward indicated that, shortly after being awarded benefits in 2006, she married and her husband was making too much money so she did not receive disability benefits.  Tr. 446.

[2] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited August 23, 2016).

Tr. 17, 85, 99, 72-177.   Ward alleged a disability onset date of May 9, 2012.[3]  Tr. 17, 55.  She

alleged disability due to asthma, arthritis, and mental conditions.  Tr. 71, 86, 100, 110, 193.

Ward's application was denied initially (Tr. 100-106) and upon reconsideration by the state

agency (Tr. 110-114).   Thereafter, she requested an administrative hearing.  Tr. 115.  On

September 16, 2013, Administrative Law Judge Penny Loucas ("ALJ") conducted an

administrative hearing.  Tr. 38-58.

In her January 2, 2014, decision (Tr. 14-37), the ALJ determined that there was new and

material evidence that no longer supported a sedentary RFC.  Tr. 17.  As a result, the ALJ did not

adopt the earlier August 21, 2006, sedentary RFC.  Tr. 17.   The ALJ concluded that Ward had

not been under a disability since May 9, 2012, the date the application was filed.  Tr. 18.   Ward

requested review of the ALJ's decision by the Appeals Council.  Tr. 12-13.   The Appeals

Council granted Ward's request for review (Tr. 168-171), and, on June 6, 2015, the Appeals

Council issued a Decision of the Appeals Council, which was unfavorable to Ward, concluding

that, based on the application filed on May 9, 2012, Ward was not disabled at any time through

January 2, 2014, the date of the ALJ's decision (Tr. 1-9).[4]

## II. Evidence

### A.    Personal, vocational and educational evidence

Ward was born in 1969, making her 44 years old at the time of the September 2013

hearing.  Tr. 54-55, 172, 202.  Ward attended school until the 10th grade.  Tr. 54, 193.   Ward's

---

[3] Ward initially alleged an onset date of January 31, 2004.  Tr. 17, 172.  She then amended her alleged onset date twice.  Tr. 17, 55, 157.  First, she amended her alleged onset date to May 12, 2005.  Tr. 17, 157.  Then, at the administrative hearing, she amended her alleged onset date to May 9, 2012, because as an SSI claim, Ward could not be approved until May 9, 2012, her application filing date.  Tr. 17, 55.

[4] It is the decision of the Appeals Council that is the final decision of the Commissioner under review in this case. *See Sims v. Apfel*, 530 U.S. 103, 106-107 (2000) ("[I]f the Appeals Council grants review of a claim, then the decision that the Council issues is the Commissioner's final decision.").

past work included packing bottles in boxes in 2000.  Tr. 42-43.  She worked in that position for less than four months.  Tr. 43.  Also, in 2000, Ward worked at Meijer grocery store for less than two months packing shelves.  Tr. 43.   Other work was part-time or did not rise to the level of substantial gainful activity.  Tr. 44-45.  Since 2007, Ward supported herself through the help of her daughter and friends.[5]  Tr. 45.  She received food stamps.  Tr. 45.  Ward usually stayed at shelters or with her daughter and sometimes with a friend. Tr. 45-46.

## B.      Medical evidence

### 1.      Treatment history[6]

#### a.      Physical impairments

Treatment records reflect that an MRI of Ward's cervical spine taken in April 2009 showed ossification of the posterior longitudinal ligament versus multiple level disc protrusions, subligamentous; and mild effacement of the cord but no significant canal stenosis was identified. Tr. 532.  In June 2009, a CT of the cervical spine showed mild degenerative changes; ossification of the longitudinal ligament in the upper and mid-cervical spine; and no fracture, dislocation or canal stenosis.  Tr. 533.

During 2011, Ward was treated at Kaiser Permanente for various conditions, including sinus problems, asthma management, neck pain, low back pain, and knee and left hip pain.  Tr. 456-458, 498, 503-508, 514-519, 520-528, 531-534, 539, 543-545, 555-557.

On April 24, 2011, after missing a step and falling down seven steps, Ward was seen at University Hospitals' emergency room for left hip pain and right ankle pain.  Tr. 267-275.  X-rays were taken of Ward's pelvis, left hip, right ankle, foot and knee.  Tr. 269-275.  The x-rays

---

[5] Ward indicated she had been married but was separating from her husband.  Tr. 46-47.

[6] Ward indicates that her primary source of care was through Kaiser Permanente and that the Exhibits in 2F (Tr. 276-437) are essentially the same as the Exhibits in 7F (Tr. 456-613).  Doc. 19, p. 3.

showed mild degenerative changes to the hip joints bilaterally; hypertonic degenerative changes in the ankle joint posteriorly; plantar spurring of the calcaneus in the right foot; mild osteoarthritis in the right ankle; and moderately advanced osteoarthritis of the right knee.  Tr. 269-275.

On July 13, 2011, Ward was seen at Kaiser Permanente emergency room with complaints of hip and knee pain.  Tr. 503-514.  On examination, Ward had a full range of motion in all extremities with the exception that she had an increase in her pain with range of motion of the right knee and left hip.  Tr. 508.  No edema was noted and distal pulses were intact.  Tr. 508. Ward complained of pain with palpation and light touch to anterior, medial knee.  Tr. 508.  Ward showed no signs of instability or crepitus.  Tr. 508.  Ward had no swelling, erythema, or increased warmth in her left hip.  Tr. 508.  Ward had no pain with rotation, mild pain with straight leg raises, and she was tender to palpation in her lateral hip.  Tr. 508.  On recheck, Ward had improved.  Tr. 508.  She was observed talking on her phone, not in distress, moving all joints easily and full range of motion without pain.  Tr. 508.   Prescriptions were provided for Tramadol (every 6 hours for pain, if needed), prednisone (for 5 days), and Percocet (every 6 hours for pain, if needed) and Ward was advised to follow up with her primary care doctor for pain control until she could see orthopedics and pain management.  Tr. 508-509.

In August 2011, Ward attended physical therapy for cervical pain.  Tr. 516-519.  On evaluation, Ward demonstrated range of motion within normal limits.  Tr. 518.  However, during the range of motion assessment, Ward was in pain and teary.  Tr. 518.  She had a decreased level of strength in her upper extremities.  Tr. 518.   Physical therapy notes reflect that pain was limiting Ward's ability to lift, reach and sleep.  Tr. 518.  Ward's physical therapist noted that her rehabilitation potential was good with adherence to a home exercise plan.  Tr. 519.

4

On September 10, 2011, Ward sought treatment at the emergency room for chronic neck pain.  Tr. 520-527.  Ward reported having been to physical therapy for two weeks; her pain had increased; and she was unable to sleep.  Tr. 520, 523.  Ward was scheduled to see pain management in the coming weeks.  Tr. 520.  On examination, Ward had tenderness in her cervical spine (mid to low) but a full range of motion and normal reflexes and strength in the lower extremities bilaterally.  Tr. 527.  Ward was prescribed prednisone and Percocet and on discharge was doing much better.  Tr. 522.  She was advised to follow up with Dr. Sharma and pain management.  Tr. 522.

In October 2011, Ward saw Dr. Sadhana Sharma, M.D., with complaints of neck pain. Tr. 543.  Ward had been scheduled for an epidural steroid injection a week earlier but had to cancel due to transportation issues.  Tr. 543.   On November 27, 2011, Ward saw Dr. Aaron R. Smith, M.D., at Kaiser Permanente with complaints of bilateral knee pain.  Tr. 552-556.  The pain was worse on the left.  Tr. 556.  Ward indicated she had been on her feet all day cooking Thanksgiving dinner.  Tr. 556.  Dr. Smith observed no swelling or redness on the left knee and no swelling, redness or instability on the right knee.  Tr. 556.  Range of motion was limited due to pain.  Tr. 556.  Dr. Smith prescribed Toradol and discussed weight loss with Ward.  Tr. 556.

In January 2012, with a pre-procedure diagnosis of cervical radiculopathy, Ward received an epidural steroid injection at the C7-T1 level.  Tr. 558-566.  Ward was seen on February 15, 2012, with complaints of a sore throat and neck pain.  Tr. 566.  She relayed that she had received a pain shot four weeks earlier but the pain had returned.  Tr. 566-573.  Ward was discharged on the same day with diagnoses of strep throat and cervicalgia with a history of cervical disc herniation.  Tr. 566, 572.

Ward did not show for an April 5, 2012, pain management appointment.  Tr. 580-581.

However, she saw Dr. Sharma on that date with complaints of intermittent swelling and pain

below her left breast.  Tr. 584-587.  Ward reported that she had recently started working out

doing water aerobics.  Tr. 584.  She requested a medication refill for chronic neck pain.  Tr. 584.

She was unable to get an epidural steroid injection because she was not accompanied by

someone to drive her home.  Tr. 584.   During the appointment, a screening for depression was

conducted.  Tr. 586-587.  On May 29, 2012, Ward received emergency room treatment for neck

and hip pain and strep.  Tr. 587-593.  On examination, Ward had a decreased range of motion in

her left hip.  Tr. 591.  On discharge, Ward was ambulatory with a steady gait and in stable

condition.  Tr. 589.

After falling the previous day, on August 27, 2012, Ward saw Dr. Sharma with

complaints of left knee pain.  Tr. 656-661.  Ward relayed that she had fallen while trying to hang

blinds on a window.  Tr. 658.  An x-ray of Ward's left knee showed no signs of fracture,

disclocation or erosions.  Tr. 655.  The x-ray showed moderate degenerative arthritis in the knee

joint, worse in the medial compartment.  Tr. 655.  There was minimal joint effusion and the

visualized soft tissues were unremarkable.  Tr. 655.  During the visit, Ward requested a

behavioral health referral.  Tr. 658.  Ward indicated she was under a lot of stress – her son was

incarcerated, her daughter was undergoing surgery, and Ward had to take care of her four

grandkids.  Tr. 658.  On examination, Ward's left knee was tender to touch and swollen; there

was no warmth or redness; she had a full range of motion but a limping gait and she favored her

right leg.  Tr. 659.  Dr. Sharma recommended ice, rest, a knee brace and follow up if swelling

and pain worsened or if there was no improvement.  Tr. 659.

On referral from Dr. Sharma, on November 27, 2012, Ward saw Dr. Josephine Fernando, M.D., of Kaiser Permanente, for a consultation regarding her bilateral knee pain.  Tr.  639-644. During her visit with Dr. Fernando, Ward reported having swelling in her knees for two years but no history of tingling or numbness and no history of instability or locking.  Tr. 640.  Ward had been doing aqua therapy on her own with good improvement.  Tr. 641.  An x-ray of Ward's right knee was taken on November 27, 2012, showing no joint effusion, mild medial and patellofemoral compartment narrowing with spurring, and no fracture or dislocation.  Tr. 637.  A cortisone injection was given during the visit with Dr. Fernando and Ward was instructed to continue with NSAIDs, heat, a home exercise plan and weight loss.  Tr. 642.  Also, on November 27, 2012, Ward saw Dr. Sharma for her neck pain and completion of social security paperwork.  Tr. 644-649.  Ward complained of an inability to work due to neck pain, left shoulder pain, numbness and tingling in her left hand and fingers, left hip pain, right hip pain, and right ankle pain.  Tr. 647.  Dr. Sharma noted that Ward had received a right knee injection that day from ortho and she had received a left hip injection the prior year with no issues at the time of the visit.  Tr.  647.  Dr. Sharma also noted that Ward had an epidural injection in her neck in January 2011 with no pain management follow up since that time.  Tr. 647.  Ward reported that she was unable to work on a consistent basis due to pain.  Tr. 647.  On examination, Dr. Sharma observed that Ward had limited range of motion in her neck, sensation was intact, and muscle strength was 4/5 on the left.  Tr. 648.

On January 21, 2013, Ward received an epidural steroid injection at the C7-T1 level.[7]  Tr. 622-625.  Ward reported some right sacroiliac joint pain that had started after she had taken a walk a week earlier.  Tr. 623.  In March 2013, Ward received an injection in her right hip for

---

[7] The record reflects that an injection may have also been administered at the S1 lumbar region on the same date. Tr. 621.

trochanteric bursitis.  Tr. 711-713.  On May 9, 2013, Ward missed an appointment with pain management.  Tr. 698.  On May 22, 2013, Ward saw Douglas Long, a physician assistant for Dr. Sharma, with complaints of right hip and gluteal pain.  Tr. 700-707.  Mr. Paul recommended that Ward apply ice to the affected region for 10 minutes, three times a day; Tylenol for discomfort, physical therapy for the right hip, and to call with concerns.  Tr. 706, 707.  A May 29, 2013, shoulder x-ray showed mild degenerative changes of the AC joint and no acute bony abnormality.  Tr. 688.  A May 29, 2013, hip x-ray showed a stable, small rounded area of sclerosis that projected over the right femoral head, suggestive of a small bone island.  Tr. 689. Also, there was mild marginal spurring of the acetabulum and the joint space was fairly well-maintained.  Tr. 689.

In early June 2013, Ward saw Dr. Sharma with a request that Dr. Sharma fill out forms setting forth her work limitations.  Tr. 694-696.  Dr. Sharma noted that Ward had a known history of cervical disc herniation, left shoulder and right knee arthritis.  Tr. 694.  Dr. Sharma also noted that Ward was unable to sit, stand or walk for more than two hours at a time or perform repetitive action.  Tr. 694.  Ward was complaining of right hip pain and was under the care of ortho and pain management.  Tr. 694.  On objective examination, Dr. Sharma observed cervical spine tenderness, minimal paraspinal tenderness, 5/5 muscle strength, Ward's sensation was intact, and a negative straight leg raise.  Tr. 695.  Also, regarding Ward's knees, Dr. Sharma observed no swelling, redness, warmth, or crackling sound on flexion/extension.  Tr. 695.  She did observe medial joint line tenderness, greater on the right than left.  Tr. 695.  Dr. Sharma observed limited range of motion in Ward's right shoulder with minimal weakness on drop arm and empty can test.  Tr. 695.  Ward exhibited limited rotation in her right hip with pain over greater trochanter.  Tr. 695.  Dr. Sharma's diagnoses were cervical disc degeneration, herniation

8

of cervical intervertebral disc, carpal tunnel syndrome, osteoarthritis of knee, and shoulder region pain.  Tr. 695.  Dr. Sharma noted that the form was completed.  Tr. 695.

On June 24, 2013, during a pain management visit, Ward reported that her hip pain was worse than her neck pain on that date.  Tr. 683.   Ward received another injection in her right hip for trochanteric bursa and was referred to orthopedics for options.  Tr. 680-687.

In October 2013, Ward saw Dr. Rallis M. Rajan, M.D., in the rheumatology department for a consultation.  Tr. 716-720.  Dr. Rajan indicated that Ward did not have clinical findings consistent with inflammatory arthritis.  Tr. 718.  He indicated that she may have fibromyalgia associated with her psychological issues.  Tr. 718.  He advised Ward of the benefits of exercise and stress management and good sleep.  Tr. 718.  Dr. Rajan indicated that the best course of treatment would be to work with behavioral health.  Tr. 718.  He did conclude that she had findings consistent with trochanteric bursitis and noted she had received a bursa injection in August 2013.  Tr. 718.  Dr. Rajan noted that Ward was working with physical therapy and would benefit from weight loss.  Tr. 718.

An October 3, 2013, MRI of the cervical spine showed multi-level disk protrusions without cord effacement and neural foraminal narrowing bilaterally at C7 to T1 with borderline impinged exiting nerve roots.  Tr. 721-722.

### b.    Mental impairments

On January 7, 2013, Ward saw social worker Dario Sanchez-Benitez, LISW ("Mr.Sanchez"), at Kaiser Permanente.  Tr. 614, 626-632.   Ward's chief complaints were pain, depression, medical problems, mood lability, and chronic PTSD.  Tr. 627.  Ward completed a Patient Health Questionnaire (PHQ-9) regarding her activities and feelings over the prior two week period.  Tr. 614.  As part of the questionnaire, Ward reported that nearly every day over the

prior two weeks she had trouble falling or staying asleep or was sleeping too much; felt tired or had little energy; and had a poor appetite or was overeating.  Tr. 614.  She also reported that more than half of the days during the prior two weeks she had little interest or pleasure in doing things; felt down, depressed, or hopeless; felt bad about herself; had trouble concentrating; and moved or spoke slowly or was moving around more than usual.  Tr. 614.  Mr. Sanchez diagnosed Ward with major depression, single episode, moderate; PTSD; and pain disorder with psychological factors.  Tr. 614, 630.  Mr. Sanchez referred Ward for a consultation the following day and advised Ward to follow up with him in three weeks.  Tr. 630.  On January 8, 2013, Ward saw Lois L. Nicholoson, C.N.S. (Clinical Nurse Specialist), at Kaiser Permanente.  Tr. 632-636.  Nurse Nicholson's diagnoses included major depression, single episode, moderate and PTSD.  Tr. 635.  Nurse Nicholson started Ward on medication - Quetiapine and Sertraline.  Tr. 635.  She advised Ward to follow up in four weeks and continue with counseling.  Tr. 636.  Ward saw Mr. Sanchez on January 23, 2013.  Tr. 617-620.  Ward's diagnoses remained unchanged from the earlier session.  Tr. 619-620.  Per Ward's attorney's request, Mr. Sanchez agreed to complete disability paperwork.  Tr. 619.

### 2.    Opinion evidence

#### a.    Treating sources

##### *Sadhana Sharma, M.D.*

Ward's treating physician Sadhana Sharma, M.D., authored two opinions regarding Ward's work-related physical abilities.  Tr. 674-679, 714-715.

##### *November 26, 2012, opinion*

In the first opinion dated November 26, 2012, Dr. Sharma noted that Ward suffered from severe arthritis.  Tr. 714.  Dr. Sharma opined that Ward's ability to lift/carry was affected by her

impairment, indicating that Ward was limited to lifting and/or carrying 5-10 pounds occasionally and frequently for 1-2 hours per day.  Tr. 714.  Dr. Sharma listed the following medical findings to support her opinion regarding Ward's lifting/carrying limitations: left arm pain and tingling; degenerative joint disease of the acromioclavicular joint, tenosynovitis, MRI left shoulder (8/07) and MRI/CT scan of cervical spine (4/09 and 6/09) – mild degenerative disc disease at C3-4, C4-5, and C5-6.  Tr. 714.  Dr. Sharma opined that Ward's impairment would affect her ability to stand/walk, limiting her to 4-5 hours in an 8-hour workday and 30-60 minutes without interruption.  Tr. 714.  Dr. Sharma opined that because of lower neck pain, Ward's ability to sit would be limited to 4-5 hours in an 8-hour workday and 30 minutes without interruption. Tr. 714.  With respect to the exertional limitations, Dr. Sharma noted that Ward should follow up with pain management as had been recommended.  Tr. 714.

In addition to exertional limitations, Dr. Sharma opined that Ward's impairment would limit other functioning, including a limitation of occasional balancing and no climbing, stooping, crouching, kneeling, or crawling because of knee pain, joint line tenderness and a limited range of motion in the lower back and neck.  Tr. 715.  Dr. Sharma referenced a July 2011 x-ray showing osteoarthritis.  Tr. 715.  Dr. Sharma opined that Ward's ability to reach, handle and push/pull would be limited because of left arm, shoulder, and hand pain; tingling; and numbness. Tr. 715.  Dr. Sharma noted cervical radiculopathy as an additional medical finding supporting her assessment.  Tr. 715.   With respect to environmental limitations, Dr. Sharma opined that Ward would have height and moving machinery restrictions due to hand, arm, and shoulder pain. Tr. 715.

Dr. Sharma opined that Ward would be off-task 0% of the time.  Tr. 715.  Dr. Sharma opined that Ward would likely be absent more than 4 days per month due to her impairments. Tr. 715.

*May 29, 2013*

In a subsequent opinion dated May 29, 2013, Dr. Sharma opined that Ward would be limited to lifting/carry up to 10 pounds occasionally, noting cervical radiculopathy and that Ward was under the care of pain management.  Tr. 674.   With respect to sitting/standing/walking, Dr. Sharma opined that, at one time without interruption, Ward could sit for 15 minutes, stand for 1 hour, and walk for 1 hour. Tr 675.  Dr. Sharma also opined that, in an 8-hour workday, Ward could sit for 3 hours, stand for 3 hours, and walk for 3 hours.  Tr. 675.  Dr. Sharma indicated that Ward did not require the use of a cane to ambulate.  Tr. 675.

With respect to Ward's ability to use her hands, Dr. Sharma opined that, with her right hand, Ward could frequently reach, handle, finger, feel and push/pull and, with her left hand, Ward could frequently feel but could never reach, handle, finger, or push/pull.  Tr. 676.  In support of her opinion, Dr. Sharma indicated that Ward had paresthesia of her left hand and finger and left shoulder pain due to degenerative joint disease of cervical disc and cervical radiculopathy.  Tr. 676.  Dr. Sharma also included a limitation with respect to Ward's use of feet. Tr. 676.  Dr. Sharma limited Ward to occasional operation of foot controls on the right and frequent operation of foot controls on the left, noting trochanteric bursitis of the left hip and osteoarthritis of the knee.[8]  Tr. 676.

With respect to postural activities, Dr. Sharma opined that Ward could never climb ladders or scaffolds, stoop, kneel, crouch or crawl and could only occasionally climb ramps and

---

[8] Dr. Sharma did not specify right or left knee.  Tr. 676.

stairs and balance.  Tr. 677.  In support of the postural limitations, Dr. Sharma noted knee

osteoarthritis.  Tr. 677.

As far as environmental limitations, Dr. Sharma opined that Ward could never tolerate

exposures to unprotected heights, mechanical moving parts, operating a motor vehicle, and dust,

odors, fumes and pulmonary irritants.  Tr. 678.  Also, Ward could only occasionally tolerate

exposure to humidity and wetness, extreme cold, extreme heat, and vibrations.  Tr. 678.  Dr.

Sharma also opined that Ward would also have some restrictions with respect to exposure to

noise.  Tr. 678.

Dr. Sharma opined that Ward would be unable to walk a block at a reasonable pace on

rough or uneven surfaces but opined that Ward would be able to perform the following activities:

shopping; travel without a companion; ambulate without using a wheelchair, walker, or 2 canes

or 2 crutches; use standard public transportation; climb a few steps at a reasonable pace with the

use of a single hand rail; prepare a simple meal and feed herself; care for her personal hygiene;

and sort, handle or use paper/files.  Tr. 679.

### Dario Sanchez-B, MDIV, MA, MSSA, LISW-S, IMFT

Ward's treating social worker Dario Sanchez authored two opinions regarding Ward's

work-related mental abilities.  Tr. 615-616, 670-672.

#### January 23, 2013, opinion

In the first opinion dated January 23, 2013, Mr. Sanchez rated Ward's mental abilities in

20 categories.[9]  Tr. 615-616.    In the category of remembering locations and work-like

---

[9] The available ratings were "1" – able to perform designated task or function with no observable limits; "2" – able
to perform designated task or function, but has or will have noticeable difficulty no more than 10 percent of the
work day or work week; "3" – able to perform designated task or function, but has or will have noticeable difficulty
from 11-20 percent of the work day or work week; "4" – able to perform designated task or function, but has or will
have noticeable difficulty more than 20 percent of the work day or work week; and "5" – not able to perform
designated task or function on regular, reliable, and sustained schedule.  Tr. 615.

procedures, Mr. Sanchez rated Ward's ability a "1." Tr. 615. In the categories of understanding and remembering very short, simple instructions and understanding and remembering detailed instructions, Mr. Sanchez rated Ward's ability a "2." Tr. 615. In the categories of carrying out very short and simple instructions; carrying out detailed instructions; interacting appropriately with the general public; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without distracting them or exhibiting behavioral extremes; and maintaining socially appropriate behavior and adhering to basic standard of neatness and cleanliness, Mr. Sanchez rated Ward's ability a "3." Tr. 615-616. In the category of maintaining attention and concentration for extended periods of time, Mr. Sanchez rated Ward's ability a "4." Tr. 615. In the remaining categories – performing activities within a schedule and maintaining regular attendance and/or being punctual within customary tolerances; sustaining ordinary routine without special supervision; working in coordination with or proximity to others without being distracted by them; making simple work-related decisions; completing a normal work day and work week without interruptions from psychological based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; responding appropriately to changes in the work setting; being aware of normal hazards and taking appropriate precautions; traveling in familiar places or using public transportation; and setting realistic goals or making plans independently of others – Mr. Sanchez rated Ward's ability a "5." Tr. 615-616. Mr. Sanchez opined that due to her impairments Ward would likely be absent from work more than 4 days per month. Tr. 616. He opined that Ward was physically and mentally disabled to return to work. Tr. 616.

Mr. Sanchez's diagnoses included major depression, single, moderate (primary) and PTSD (secondary).  Tr. 616.  Mr. Sanchez explained that Ward suffered from clinical depression, chronic PTSD, and chronic pain.  Tr. 616.

### April 8, 2013, opinion

In a subsequent opinion dated April 8, 2013, Mr. Sanchez rated Ward's work-related mental abilities in 10 categories.[10]  Tr. 670-671.  Mr. Sanchez rated Ward's abilities as moderately impaired in five categories – ability to make judgments on simple work-related decisions; interact appropriately with the public; interact appropriately with supervisors; interact appropriately with co-workers; and respond appropriately to usual work situations and changes in a routine work setting.  Tr. 670-671.   Mr. Sanchez rated Ward's abilities as markedly impaired in the other five categories – understand and remember simple instructions; carry out simple instructions; understand and remember complex instructions; carry out complex instructions; and ability to make judgments on complex work-related decisions.  Tr. 670.   In support of his ratings, Mr. Sanchez noted that Ward suffered from major depression, single, moderate and PTSD, chronic stage.  Tr. 670.  With respect to the ratings for social functioning, Mr. Sanchez noted that he had never observed Ward interacting with co-workers or immediate supervisors and therefore Mr. Sanchez's moderate rating was an "inference from the context of her [Ward's] presenting problems."  Tr. 671.

Mr. Sanchez indicated that the limitations contained in his April 8, 2013, opinion were found to be first present on April 2, 2013, which Mr. Sanchez indicated was Ward's last counseling session.  Tr. 671.  Mr. Sanchez reported that he did not detect any substance abuse.  Tr. 671.

### b.    Consultative examining sources

---

[10] The available ratings were – none, mild, moderate, marked and extreme.  Tr. 670-671.

On August 13, 2012, Deborah Ann Koricke, Ph.D., conducted a psychological evaluation.  Tr. 446-454.  Ward relayed to Dr. Koricke that she was applying for disability because "I have asthma, arthritis in my neck, right knee, right ankle, and left shoulder, lots of memory loss, and I am bipolar."  Tr. 447.   She explained to Dr. Koricke that she had already been found to be disabled but lost benefits because she got married.  Tr. 447.  Ward could not recall if she had been in the hospital other than for pregnancy stays.  Tr. 447.  Ward could not recall when or why she had been arrested; she thought she had been in jail but not in prison.  Tr. 448.  Ward reported a significant history of substance abuse and indicated that she believed that was the cause of her memory problems.  Tr. 447.

Dr. Kornicke's diagnoses included cocaine dependence, in full remission three plus years per the claimant's reports; cannabis dependence, in full remission three plus years per the claimant's reports; and depressive disorder, not otherwise specified.  Tr.  451.  Dr. Koricke indicated that she had questions regarding malingering based on the examination.  Tr. 451.  As far as Ward's reliability, Dr. Koricke indicated that it was "very difficult to assess the reliability of this individual as she told me she remembered virtually nothing about her history."  Tr. 452.

Dr. Koricke discussed Ward's abilities in four work-related mental abilities.  Tr. 453-454.  With respect to Ward's abilities and limitations in understanding, remembering and carrying out instructions, Dr. Koricke stated:

> The claimant reports she had difficulties in school, but that her memory has become very, very poor over the last few years.  She has no way to explain why it has become very poor.  However, she seems to have great difficulty understanding and applying instructions.  On a day-to-day basis, it seems virtually impossible for her to understand, remember, and follow instructions and directions if what I am seeing today is a true reflection of her abilities.

Tr. 453.

With respect to Ward's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks, Dr. Koricke stated:

> The claimant is able to perform very basic tasks such as dressing and grooming on her own.  She will cook food a little bit, but depends on her cousin with whom she is living to do virtually all the housework.  The claimant has great difficulties in concentration.  She said this is because of her pain and poor memory.

Tr. 453.

Regarding Ward's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting, Dr. Koricke stated:

> The claimant denied she had any particular difficulties getting along with supervisors or coworkers.  However, with her poor memory it seems that she would forget virtually every instruction that any supervisor gave her likely causing a problem in a relationship with a supervisor.  Likewise, coworkers are likely to be frustrated with her with her constant reporting she cannot remember anything of what she is told.

Tr. 453.

With respect to Ward's abilities and limitations in responding appropriately to work pressures in a work setting, Dr. Koricke stated:

> The claimant says that she has never had inappropriate or irritable behavior in work settings.  She was not irritable with me despite seeming to be in a lot of pain and reporting she is in a lot of pain.

Tr.  453-454.

### c.    Reviewing sources

_Reviewing opinions on initial review_

On initial review, on August 7, 2012, state agency reviewing physician Gerald Klyop, M.D., assessed Ward's physical RFC.  Tr. 78-80.  Dr. Klyop opined that Ward had the following exertional limitations – lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand

and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and, other than stated limits for lift and/or carry, push and/or pull unlimitedly.  Tr. 79.  With respect to postural limitations, Dr. Klyop opined that Ward would be limited as follows – never climbing ladders, ropes, or scaffolds; occasionally climbing ramps or stairs and crawling; and frequently kneeling and crouching.  Tr. 79.   Dr. Klyop opined that Ward would have no limitations regarding balancing and stooping.  Tr. 79.   The postural limitations were based on Ward's spinal impairment and asthma.  Tr. 79.  Dr. Klyop found no manipulative, visual, or communicative limitations.  Tr. 79.  With respect to environmental limitations, Dr. Klyop concluded that Ward would need to avoid concentrated exposure to high humidity and dust, fumes, gas, smoke, irritants and pollutants.  Tr. 79-80.  In assessing Ward's physical RFC, Dr. Klyop concluded that new and material evidence no longer supported the earlier 2006 sedentary RFC.  Tr. 80.

On initial review, on August 27, 2012, state agency reviewing psychologist Patricia Semmelman, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 76-77) and a Mental RFC Assessment (Tr. 80-82).  In the PRT, Dr. Semmelman opined that Ward's mental impairments did not satisfy a Listing.  Tr. 77.  In assessing Ward's limitations, Dr. Semmelman concluded that Ward had mild limitations in restrictions of daily living and in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace.  Tr. 77.  There were no episodes of decompensation of extended duration.  Tr. 77.  Due to new evidence, Dr. Semmelman did not adopt the 2006 ALJ RFC.  Tr. 77.   In assessing Ward's mental RFC, Dr. Semmelman concluded that Ward could complete simple tasks; was capable of adequate concentration for simple, routine, tasks; could have superficial encounters with coworkers and

supervisors but no contact with the general public; and could perform low stress, low production work in a relaxed setting with minimal routine changes.[11]  Tr. 80-82.

*Reviewing opinions on reconsideration*

Upon reconsideration, on September 25, 2012, reviewing physician Teresita Cruz, M.D., assessed Ward's physical RFC.  Tr. 92-94.  Dr. Cruz reached the same conclusions as Dr. Klyop. Tr. 78-80, 92-94.  Like Dr. Klyop, in assessing Ward's physical RFC, Dr. Cruz concluded that new and material evidence no longer supported the earlier 2006 sedentary RFC.  Tr. 80, 94.

Upon reconsideration, on September 19, 2012, state agency reviewing psychologist Caroline Lewin, Ph.D., completed a PRT (Tr. 90-91) and a Mental RFC Assessment (Tr. 94-96). Dr. Lewin reached the same opinions as Dr. Semmelman.  Tr. 76-77, 80-82, 90-91, 94-96.  Also, like Dr. Semmelman, due to new evidence, Dr. Lewin did not adopt the 2006 ALJ RFC.  Tr. 77, 91.

d.  **Testimonial evidence**

1.  **Plaintiff's testimony**

Ward was represented at and testified at the hearing.[12]  Tr.  40, 42-52, 53, 54-55.  In explaining why she was unable to work, Ward indicated that she had crushing pain in her hip bone and pain in her lower back.  Tr. 47.  She indicated that sometimes it is hard for her to concentrate and she is unable to get along with people because of her depression and pain.  Tr. 47.  Because of her depression and pain, she gets irritated really fast and is unable to concentrate.  Tr. 48.  Also, Ward has a lot of pain in her neck which "stops a lot of movement and things like that."  Tr. 47-48.  Ward reported problems with balance, indicating that she had

---

[11] In assessing Ward's mental RFC, Dr. Semmelman indicated that certain categories were "[n]ot ratable on available evidence[.]"  Tr. 81-82.  Nevertheless, she was able to offer her opinion regarding limitations resulting from Ward's mental impairments.  Tr. 80-82.

[12] During her testimony, Ward indicated that she needed to stand up.  Tr. 51.

fallen a few months prior and sometimes cannot stand steady.  Tr. 48.  She has swelling in her knee and ankle and sometimes in her shoulder.  Tr. 48.  To try to deal with the swelling, Ward elevates her right leg to hip level approximately four to five times each day. Tr. 48.   Ward's depression and anxiety started with her physical problems.  Tr. 49-50.

At times, Ward needs assistance dressing and showering because of the pain in her neck and because she can hardly bend her arm or reach for things.  Tr. 49.   Ward does not drive.  Tr. 49.  She indicated she was deemed "disabled through RTA and a para-transfer" took her around. Tr. 49.

She reported that she was scheduled to have an MRI done of her spine and blood work to try to determine what was wrong with her.  Tr. 49.  Ward has been seeing Dr. Sharma for about four to five years and Ward saw her about once per month.  Tr. 51.  Beginning around January 2013, Ward was seeing a therapist, Mr. Sanchez, twice a month for her mental health problems. Tr. 50.

Ward explained that her daily routine consisted of lying around a lot.  Tr. 51.  When she wakes up, it takes her a while to get moving.  Tr. 51.  She elevates her leg and, with the help of her daughter, she tries to get herself cleaned up.  Tr. 51.  During the day, she tries to do some exercises that she learned through therapy.  Tr. 51.  Ward attends doctor appointments.  Tr. 51. Her daughter usually attends with her.  Tr. 51.

As far as medication side effects, Ward's medications make her very drowsy and they also make her spacey.  Tr. 51-52.   Because of stiffness in her neck and pain, Ward has a very difficult time sleeping and wakes up tired due to a lack of sleep.  Tr. 52.

**2.    Vocational Expert**

Vocational Expert ("VE") Gene Burkhammer testified at the hearing.  Tr. 52-57.  The VE described Ward's past work as a hand packager, a medium level exertion, SVP-2 job and as a production assembler, a light level exertion, SVP-2 job.[13]  Tr. 53-54.

The ALJ asked the VE to assume a hypothetical individual of the same age as and with the same education and work history as Ward who could engage in light exertional level work; stand and/or walk six hours in an 8-hour workday; should never climb any ladders, ropes or scaffolds; could occasionally climb ramps and stairs; could occasionally crawl; could frequently kneel and crouch, with unlimited balancing; should avoid jobs that involve exposure to humidity and respiratory irritants two-thirds of the day or more;  could perform unskilled work; could maintain concentration, persistence and pace for unskilled work; could interact with the general public, coworkers, and supervisors to speak, signal, take and carry out instructions; and could adjust to routine-type changes in the workplace setting.  Tr. 55-56.  The VE indicated that the hypothetical individual could perform Ward's past light level work.  Tr. 56.  Also, the VE testified that there would be other light, unskilled (all SVP-2) jobs that the hypothetical individual could perform, including (1) merchandise marker, with approximately 700 jobs available locally, 8,000 in the state, and 160,000 in the nation; (2) gas station cashier, with approximately 4,000 jobs available locally, 60,000 in the state, and 1 million in the nation and (3) housekeeping cleaner, with approximately 2,000 jobs available locally, 30,000 in the state, and 500,000 in the nation.  Tr. 56-57.

---

[13] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions  in 20 C.F.R. § 416.968, unskilled work corresponds to an SVP of 1-2.  *Id.*

For her second hypothetical, the ALJ asked the VE whether there would be any jobs available if the hypothetical individual would miss work four days a month and be off-task 20% of the day.[14]  Tr. 57.  The VE said there would be no jobs.  Tr. 57.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[15] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a

---

[14] The ALJ indicated that the second hypothetical was premised upon taking everything Ward said as true.  Tr.57.

[15] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

listed impairment,[16] claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v.*

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy.  *Id.*

### IV. The Appeals Council Decision

After granting Ward's request for review of the ALJ's January 2, 2014 (Tr. 168-171), on

June 6, 2015, the Appeals Council issued its decision (Tr. 1-9).  The Appeals Council concluded

that the ALJ had intended to find Ward restricted to a range of light rather than medium work.

Tr. 5.  Accordingly, the Appeals Council affirmed the ALJ's findings but edited the RFC to

reflect a limitation to a range of light rather than medium work.  Tr. 5.  The Appeals Council's

findings were as follows:

1.  Ward had not engaged in substantial gainful activity since May 9, 2012.
    Tr. 6.

---

[16] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 416.925.

2.    Ward had the following severe impairments: multi-site arthritis, asthma, major depressive disorder, and post-traumatic stress disorder.  Tr. 6-7.

3.    Ward did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 7.

4.    Ward had the RFC to perform light work but with the ability to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk 6 hours and sit 6 hours in an 8-hour workday; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs and occasionally crawl; frequently kneel and crouch; unlimited balancing; should avoid jobs that involve exposure to humidity and respiratory irritants two-thirds of the day or more; could perform unskilled work; could interact with the general public, coworkers, and supervisors to speak, signal, take and carry out instructions; and could adjust to routine type changes in a workplace setting.  Tr. 7.

5.    Ward's subjective complaints were not fully credible.  Tr. 7.

6.    Ward had past work as a production assembler and hand packager.  Tr. 7.[17]

7.    Ward was 44 years old, which is defined as a younger individual, and had a limited or less education.  Transferability of job skills was not an issue in the case.  Tr. 7.

8.    Based on the VE testimony, considering Ward's age, education, work history and RFC, there were a significant number of jobs in the national economy that Ward could perform, including merchandise marker, gas station cashier, and housekeeping cleaner.  Tr. 7.

9.    Ward was not disabled at any time through January 2, 2014, the date of the ALJ's decision.  Tr. 7.

## V. Parties' Arguments

Ward argues that the RFC is flawed.  She contends that, because the record is not clear

that the ALJ intended to assess a light rather than medium exertional level RFC, the Appeals

Council, before making a correction to the RFC, should have remanded the matter to the ALJ for

---

[17] The Appeals Council made no finding as to whether Ward could perform her past work.  Tr. 7.  The ALJ had concluded that Ward could perform her past work as a production assembler.  Tr. 32.

clarification. Doc. 19, p. 11, Doc. 21, pp. 3-4.  She also argues that the Commissioner did not

properly assess her RFC due to the failure to provide controlling weight to the opinions of her

treating physician Dr. Sharma and the failure to give any weight to her treating social worker Mr.

Sanchez.  Doc. 19, pp. 10-20, Doc. 21, pp. 1-9.   In light of these failures, Ward contends that

the Commissioner did not meet her burden at Step Five because the VE hypothetical upon which

the Commissioner relied did not accurately portray her limitations.  Doc. 19, pp. 20-21, Doc. 21,

pp. 3-4.

Ward also argues that the Commissioner erred in concluding that there was new and

material evidence, which allowed the Commissioner to disregard the earlier 2006 sedentary RFC

determination.   Doc. 19, p. 20, Doc. 21, pp. 9-10.

In response, the Commissioner argues that the Appeals Council properly exercised its

authority to review the ALJ's decision and properly modified the ALJ's decision.  Doc. 20, pp.

10-12.  The Commissioner also argues that the Commissioner properly evaluated the medical

opinion evidence when assessing Ward's RFC.  Doc. 20, pp. 12-16.  The Commissioner

contends that the VE hypothetical contained all limitations that the Commissioner concluded

were supported by the evidence and therefore the Commissioner was entitled to rely upon the

VE's response to support her Step Five determination.  Doc. 20, pp. 17-18.

The Commissioner also argues that new evidence justified the Commissioner's decision

to disregard the 2006 sedentary RFC and reassess Ward's RFC.  Doc. 20, pp. 16-17.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."[18] *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## A. The Commissioner properly assessed Ward's RFC and the Step Five determination is supported by substantial evidence

### 1. Appeals Council's modification of RFC

The Appeals Council concluded that the ALJ "intended to find the claimant entitled to a range of light work with the . . . restrictions rather than medium work." Tr. 5. In reaching this

---

[18] As discussed above, on April 20, 2015, the Appeals Council granted Plaintiff's request for review of the ALJ's January 2, 2014, decision. Tr. 168-171. Thereafter, on June 6, 2015, the Appeals Council issued a Notice of Appeals Council Decision Unfavorable, enclosing "the final decision of the Commissioner of Social Security in [Plaintiff's] case." Tr. 1-9. Accordingly, the final decision for judicial review in this case is the decision of the Appeals Council. *See Sims*, 530 U.S. at 107; *see also Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) ("[I]t is well settled that final action by the Appeals Council becomes indeed the final determination of the Secretary for purposes of judicial review under section 205(g), 42 U.S.C. § 405(g)).");*Spaw v. Comm'r of Soc. Sec.*, 110 F.3d 65, 1 (6th Cir. 1997) (table decision) (reviewing the Appeals Council's decision for substantial evidence where the Appeals Council had granted a claimant's request for review and ultimately concurred with the ALJ's finding that the claimant was not disabled); *Torres-Tricoche v. Astrue*, 2010 WL 606793, * (D. Puerto Rico) (Feb. 18, 2010) ("Where the Appeals Council accepts review of the ALJ's decision and issues its own decision, that decision becomes the final decision of the Commissioner . . . [and] it is the court's role to examine the record and determine whether there is substantial medical evidence that supports the Appeals Council's decision.").

conclusion, the Appeals Council relied upon its review of the ALJ's decision and the evidence relied upon by the ALJ in assessing the RFC as well as an audit of the hearing recording wherein the ALJ posed a hypothetical question to the VE  that consisted of a light-level work and the VE responded by identifying light jobs.  Tr. 5, 55-57;  *See* 20 C.F.R. § 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.").

Ward contends that it was error to modify the RFC without a remand.  However, as set forth in the Regulations, the Appeals Council has authority to "affirm, modify or reverse the administrative law judge hearing decision."  20 C.F.R. § 416.1479.   Also, under the Regulations, "[i]f someone can do medium work, we determine that he or she can also do sedentary and light work."  20 C.F.R. § 416.967(c).  Moreover, Ward has not demonstrated that the Appeals Council's decision to modify the RFC from a reduced range of medium exertional work to a reduced range of light exertional work is unsupported by substantial evidence or not sufficiently explained. Accordingly, the Court finds that the Appeals Council did not commit reversible error by modifying the RFC.

### 2.  Weighing of opinion evidence

Ward also argues that the RFC is flawed because of errors with respect to weighing of treating source opinion evidence.  More particularly, Ward contends that the Commissioner erred by not assigning controlling weight to Dr. Sharma's opinions and by assigning no weight to Mr. Sanchez's opinions.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the

other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c )(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 416.927(c).  However, while an ALJ's decision must include "good reasons" for the weight provided, the ALJ is not obliged to provide "an exhaustive factor-by-factor analysis."  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

### a.  Dr. Sharma's opinions

The treating physician rule is applicable to Dr. Sharma's opinion because she was a treating physician with an ongoing treatment relationship with Ward. Following an in depth discussion of the medical evidence, the ALJ explained in detail the reasons for assigning little weight overall to Dr. Sharma's opinions.[19]  In particular, the ALJ stated:

> As for the opinion evidence, treating source Dr. Sharma completed questionnaires in November 2012 and May 2013 (Exhibits 12F; 14F). Interestingly, Dr. Sharma's appointment notes show that the claimant brought the more recent form to be completed on June 5, 2013, which seems inconsistent with the form being dated

---

[19] The Appeals Council did not disturb the ALJ's decision regarding the weight assigned to the medical opinion evidence.

May 29, 2013. The claimant was a no-show to her May 5, 2013 appointment. Regardless, at the June appointment, Dr. Sharma noted that *the claimant stated* that she had work limitations and was unable to sit, stand, and or walk for greater than two hours at a time. Notably, the claimant's examination revealed that her muscle strength was 5/5, her sensation was intact, her deep tendon reflexes were normal and symmetric, and her straight leg raise testing was negative. The claimant's knees had no swelling, redness, or warmth (Exhibit B13F).

The questionnaires indicate that Dr. Sharma diagnosed the claimant with severe arthritis. Dr. Sharma opined that the claimant was able to shop, travel without assistance, use public transportation, climb a few steps at a reasonable pace, care for her personal hygiene, and sort, handle, and use paper files. Dr. Sharma opined that the claimant was [sic] would never be off-task during the workday. The claimant did not require a cane to ambulate. The foregoing was generally supported by the evidence of record (Exhibits B12F; B14F).

However, in May 2013, Dr. Sharma opined that the claimant could sit for three hours, stand for three hours, and walk for three hours total in an eight-hour workday. Dr. Sharma opined that the claimant was limited to lifting up to 10 pounds and had left hand limitations due to degenerative joint disease of the cervical spine and radiculopathy. She further opined that the claimant had postural limitations due to knee osteoarthritis. The undersigned found that her suggestion of limiting the claimant to never climbing ladders or scaffolds and occasionally climbing ramps and stairs was supported by the evidence. However, the record does not support many of the other limitations. For example, Dr. Sharma opined that the claimant could only occasionally balance when the medical evidence does not show that the claimant had any issue with maintaining her balance (Exhibit B12F; See Exhibit B7F, showing that the claimant had no instability).

Dr. Sharma wrote in her November 2012 questionnaire that the claimant's cervical MRI showed only mild degenerative disc disease at the C3-C6 levels; however, she limited the claimant to carrying only 5-10 pounds for a maximum of one or two hours a day, which was not supported by the objective evidence. The November 2012 opined limitation of standing and/or walking for a maximum of four or five hours in an eight-hour day was not supported. In fact, as previously discussed, Dr. Sharma concluded that the claimant could sit for three hours, stand for three hours, and walk for three hours in an eight-hour workday in May 2013, which appears less limiting. In November 2012, Dr. Sharma opined that the claimant could never perform any postural activities except for occasional balancing, which was not supported. In fact, Dr. Sharma indicated that the claimant could never climb in November 2012 and then found that the claimant could occasionally climb ramps or stairs in May 2013. The November 2012 opinions were somewhat more limiting than the May 2013 opinions discussed above. The foregoing indicates that either the claimant's symptoms improved, or Dr. Sharma's opinions were not wholly consistent. Dr. Sharma's opined

environmental limitations of no heights or moving machinery were not supported by the objective evidence of only mild degenerative changes.  Therefore, the undersigned gave Dr. Sharma's opinions little weight overall (Exhibit B12F).

Tr. 27-28 (emphasis in original).

Notwithstanding the ALJ's detailed explanation of the weight assigned to Dr. Sharma's opinions, Ward nevertheless contends that the Commissioner failed to adhere to the treating physician rule.  Ward's arguments generally consist of a recitation of what is contained in Dr. Sharma's two opinions.  Doc. 19, pp. 12-13.  Her arguments in this regard are conclusory and insufficient to establish a failure to adhere to the treating physician rule.  *See McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." ) (internal citations omitted).

As far as specific challenges to the ALJ's consideration of Dr. Sharma's opinion, Ward claims that the ALJ improperly concluded that there was a lack of evidence of instability to support Dr. Sharma's opinion that Ward should be limited to occasional balancing.  Doc. 19, p. 13.   However, in making this argument, Ward concedes that there is evidence in the record showing that she was able to ambulate effectively without assistance on more than one occasion.  Doc. 19, p. 13 (citing Tr. 568, 589).  She argues, though, that there is evidence of an instance when Ward rolled her ankle while walking down stairs and injured her ankle and foot.  Doc. 19, pp. 13-14 (citing Tr. 267, 481-482).  Therefore, she contends that there is evidence of instability such that the ALJ erred in weighing Dr. Sharma's opinion.  However, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir.2001)

(internal citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773 (internal citations omitted).  Also, "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir. 2004).

Ward's suggestion that the ALJ improperly took into consideration the fact that Dr. Sharma's opinions were based on Ward's own subjective complaints (Doc. 19, p. 12) is also without merit.  *See Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009) (affirming ALJ's decision giving less than controlling weight to treating physician opinion where ALJ took into consideration the fact that opinion was based on subjective rather than objective medical data).

Ward also claims that the ALJ improperly played doctor when assessing Dr. Sharma's opinions because she concluded that Dr. Sharma's significant limitations were unsupported by evidence, including objective medical evidence showing mild degenerative disc disease.   Doc. 19, p. 14.  It is true that an "ALJ may not substitute his opinion for that of a physician[.]"  *Poe*, 342 Fed. Appx. at 157.  However, "an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding."  *Id.*  Further, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and a claimant's RFC will be assessed "based on all of the relevant evidence" of record. 20 C.F.R. § 416.945(a); 20 C.F.R. § 416.946(c).

Based on the foregoing, the Court concludes that Ward has failed to demonstrate a basis for reversal and remand based on the Commissioner's weighing and consideration of Dr.

Sharma's opinion.[20]  Here, the ALJ acknowledged Ward's impairments, considered the medical evidence, weighed Dr. Sharma's opinion, explained the reasons why little weight overall was assigned to Dr. Sharma's opinions, and fully and adequately explained her RFC assessment.

### b.  Mr. Sanchez's opinions

The Regulations define a "treating source" as a claimant's "physician, psychologist, or other acceptable medical source" who has an ongoing treatment relationship with the claimant. 20 C.F.R. §416.902.  Other "acceptable medical sources" include licensed optometrists, podiatrists, or qualified speech-language pathologists.  20 C.F.R. §416.913(a).   While Mr. Sanchez, a social worker, may have had a treatment history with Ward, he is not a "treating source" subject to controlling weight analysis under the treating physician rule. 20 C.F.R. 416.913(d) (setting forth examples of "other sources"); *see e.g., Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997) (treating chiropractor as an "other source," not an "acceptable medical source" within meaning of regulation, thus ALJ has discretion to determine appropriate weight to accord chiropractor's opinion based on all evidence in record).

Ward acknowledges that the ALJ correctly concluded that Mr. Sanchez is not considered an acceptable medical source.  Doc. 19, p. 15.  However, she contends that, pursuant to SSR 06-03p, the ALJ was nonetheless required to evaluate his opinion using the same factors used to

---

[20] To the extent that Ward contends that error occurred because more weight was provided to reviewing physician opinions than to treating source opinions, Ward has failed to demonstrate error.  *See Helm v. Comm'r of Soc. Sec.*, 405 Fed. Appx. 997, 1002 (6th Cir. 2011) ("There is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record. The opinions need only be 'supported by evidence in the case record.'") (discussing  SSR 96-6p, 1996 WL 374180, at *2 (1996)).  Here, the ALJ considered and provided good  reasons for discounting Dr. Sharma's opinions and Ward has failed to demonstrate that the state agency reviewing physicians' opinions limiting Ward to a reduced range of light exertional work are not supported by substantial evidence.

evaluate acceptable medical sources,[21] and there is a basis for providing some weight to his

opinion.  Doc. 19, p. 15.

Although not an acceptable medical source under the Regulations, the ALJ did consider

and weigh Mr. Sanchez's opinion.  Tr. 28.  In doing so, the ALJ stated:

> In addition, Dario Sanchez completed questionnaires in January 2013 and April
> 2013.  However, Mr. Dario[22] was a licensed social worker and not a medically
> acceptable source.  In addition, he suggested limitations that were not supported
> by the medical evidence of record.  For example, he opined that the claimant had
> marked limitations in understanding and remembering simple instructions, which
> was inconsistent with the evidence of record, including claimant's own report
> (Exhibits B8F, B9F, B11F; *See* Exhibit B5E).  Accordingly, the undersigned gave
> Mr. Dario's reports little weight.

Tr. 28.

As noted, the ALJ considered Mr. Sanchez's opinions and found his opinions inconsistent

with other evidence of record.   Inconsistency is a proper basis for discounting a medical opinion.

*See* 20 C.F.R. §416.927(c)(4).   Furthermore, a court "may not try the case *de novo*, nor resolve

conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.

In light of the foregoing, the Court concludes that Ward has not demonstrated error with

respect to the ALJ's consideration of the opinions of Mr. Sanchez, who, as properly recognized

by the ALJ, is not an acceptable medical source.

### 3.  The Commissioner's Step Five determination is supported by substantial evidence

Ward argues that the ALJ and Appeals Council did not meet their burden at Step Five

because the VE hypothetical did not include all of Ward's limitations.  Doc. 19, pp. 20-22.  As

discussed above, consistent with the Regulations, the Commissioner weighed the medical

---

[21] These factors include (1) examining relationship, (2) length, frequency, nature, and extent of the treatment
relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors that tend to support or
contradict the opinion.  20 C.F.R. §416.927(c).

[22] In referring to Mr. Sanchez, the ALJ used Mr. Sanchez's first name – Dario.

evidence and assessed Ward's RFC based on all relevant evidence and Ward has not shown that the RFC is not supported by substantial evidence.  Moreover, the VE testimony upon which the ALJ and Appeals Council relied was provided in response to a hypothetical question that accurately portrayed the limitations found to be credible and supported by the evidence and contained in the RFC.  Thus, the VE's testimony constitutes substantial evidence on which the Commissioner was entitled to rely to support the finding of no disability.  *See Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

**B.     The Commissioner did not err in concluding that she was not bound  by the prior 2006 sedentary RFC determination**

In *Drummond v. Comm'r of Soc. Sec*, the Sixth Circuit stated that "absent evidence of improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ."   126 F.3d 837, 842 (6th Cir. 1997).  The Social Security Administration acquiesced in this ruling.  *See* Acquiescence Ruling 98-4(6), 1998 SSR LEXIS 5 (June 1, 1998).

The Commissioner concluded that new and material evidence no longer supported the prior 2006 sedentary RFC.  Tr. 17.  Thus, the Commissioner did not adopt the prior sedentary RFC and proceeded to assess Ward's RFC based on the evidence of record.  Tr. 17.  Ward contends that there is evidence of continued deterioration and therefore the ALJ's decision not to adopt the earlier sedentary RFC was error.  Doc. 19, p. 20.

As noted above, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner*, 745 F.2d at 387.  Furthermore, the state agency reviewing physicians concluded that new and material evidence no longer supported a sedentary RFC.  Tr. 80, 94.  In light of this evidence, and since it is not for this Court to try the case *de*

*novo*, Ward is unable to show error with the Commissioner's determination that new and material evidence no longer supported the earlier 2006 sedentary RFC.

## VII. Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.


Dated: August 24, 2016

Kathleen B. Burke
United States Magistrate Judge